# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

FRANK KRUSE, *as personal representative* )
*of Jacob Jordan, deceased,* )
      **Plaintiff,** )
       )
**vs.** )    **CIVIL ACTION NO. 11-00513-KD-C**
       )
**DALE BYRNE,** *et al.*, )
      **Defendants.** )

## ORDER

This action is before the Court on the Motion for Summary Judgment (Doc. 110) and supporting documents (Docs. 112 – 116, 118) filed by Defendant Jimmie L. Williams ("Nurse Williams") pursuant to Federal Rule of Civil Procedure 56, along with the Response in opposition (Doc. 128) and supporting exhibits (Docs. 129 – 135) filed by Plaintiff Frank Kruse, as personal representative of Jacob Jordan, deceased ("Plaintiff"), and Nurse Williams's Reply (Doc. 137) to said Response. The motion has been taken under submission and is ripe for adjudication as to Nurse Williams.[1] (Doc. 138 at 5). Upon consideration, and for the reasons stated herein, the Court finds that the motion is due to be **GRANTED** as to the federal claim against Nurse Williams and that the remaining state law claims in this action are due to be **DISMISSED without prejudice**.

### I.      Procedural History

On September 7, 2011, Plaintiff initiated this action by filing a Complaint with the Court,

---

[1]     Defendants Connie Pimperl and Kenneth May were also parties to the motion for summary judgment. In its previous Order (Doc. 138), the Court granted the motion as to Pimperl and May, finding that Plaintiff had abandoned his claims against them by "expressly declin[ing] to respond to the motion as it relates to Pimperl and May." (Id. at 4-5). The Court withheld ruling on the motion as it relates to Williams, finding that additional discovery as to Plaintiff's witness Jemal Walker should be allowed before ruling on the motion as to Nurse Williams. Accordingly, the Court reopened discovery for a limited period for this limited purpose and allowed Nurse Williams the opportunity to supplement her Reply with any new evidence obtained. (Id. at 5).

    In a letter dated October 25, 2013, that was addressed to the Court and copied to opposing counsel, counsel for Nurse Williams informed the Court he did not believe that further deposing Walker would be fruitful, and therefore he did not intend to submit any further evidence or argument in support of Nurse Williams's motion for summary judgment.

asserting claims for violations of 42 U.S.C. § 1983 and for wrongful death under state law. (Doc. 1). On April 11, 2012, Plaintiff, with leave of the Court (Doc. 24), filed his Amended Complaint (Doc. 25), which added Nurse Williams and others as parties to this action. On July 25, 2012, again with leave of the Court (Doc. 74), Plaintiff filed his Second Amended Complaint (Doc. 75), the operative complaint in this action.[2] The Second Amended Complaint (Doc. 75) alleged claims against Nurse Williams for 1) deliberate indifference to Plaintiff's serious medical needs in violation of 42 U.S.C. § 1983 (Count I), 2) for wrongful death under state law (Count V), and 3) for medical malpractice under state law (Counts VI). Plaintiff's claims are based on the circumstances surrounding the death of Jacob Jordan ("Jordan") on July 9, 2010, while in the custody of the Baldwin County Corrections Center ("BCCC").[3]

On November 9, 2012, the Court denied Nurse Williams's motion to dismiss the claims against her based on qualified immunity as to the federal claims and absolute immunity as to the state law claims. (Docs. 95, 98). On August 30, 2013, Nurse Williams filed the present Motion for Summary Judgment (Doc. 110), which was timely pursuant to the Court's scheduling order (see Docs. 103, 106).

Nurse Williams argues that she is due summary judgment in her favor for the following reasons:

1. She is entitled to qualified immunity as to Plaintiff's § 1983 claim in Count I. (Doc. 112 at 17-30).

2. Plaintiff cannot show causation between Nurse Williams's actions and Jordan's

---

[2] "Under . . . federal law, an amended complaint supersedes the initial complaint and becomes the operative pleading in the case." Lowery v. Ala. Power Co., 483 F.3d 1184, 1219 (11th Cir. 2007).

[3] The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3) (civil rights) and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

death so as to subject her to liability for any of Plaintiff's claims against her. (Id. at 30-33).

3. She is entitled to absolute and/or state-agent immunity as to Plaintiff's state law claims. (Id. at 33-41).

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

**(1) *Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
    (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
    (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

**(2) *Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

**(3) *Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

**(4) *Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d

604, 608 (11th Cir. 1991) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). As the

Eleventh Circuit has articulated, however,

> The nature of this responsibility varies . . . depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial.

> . . . <u>Celotex</u> requires that for issues on which the movant would bear the burden of proof at trial,

>> that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come [s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

[<u>United States v. </u>]<u>Four Parcels</u>[ <u>of Real Property</u>], 941 F.2d [1428, ]1438[ (11th Cir. 1991)] (citations and internal quotation marks omitted; emphasis in original).

For issues, however, on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim in order to discharge this initial responsibility. Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

<u>Four Parcels</u>, 941 F.2d at 1437-38 (citations, footnote, and internal quotation marks omitted; emphasis in original).

If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. <u>Coats & Clark</u>, 929 F.2d at 608. If, however, the movant carries the initial summary judgment burden in one of the ways discussed above, responsibility then devolves upon the non-movant to show the existence of a genuine issue as to the material fact.

For issues on which the movant would bear the burden of proof at trial, the non-movant, in order to avoid summary judgment, must come forward with evidence

4

sufficient to call into question the inference created by the movant's evidence on the particular material fact. Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the two parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial-that is, such that no reasonable jury could find for the non-movant-should the movant be permitted to prevail without a full trial on the issues. Anderson[ v. Liberty Lobby, Inc.], 477 U.S. [242,] 249-50, 106 S. Ct. [2505,] 2511[ (1986)].

For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. Celotex, 477 U.S. at 332, 106 S. Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. See Melissa L. Nelkin, One Step Forward, Two Steps Back: Summary Judgment After Celotex, 40 Hastings L.J. 53, 82-83 (1988).

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (headings and footnotes omitted).

The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (citation omitted).

If a non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether a non-moving party has met its burden, the Court

must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

## III. Facts[4]

Jordan was diagnosed with Addison's disease[5] when he was approximately seventeen years old. (Doc. 113-7 at 2). On June 25, 2010, while incarcerated in Mobile County Metro Jail, Jordan complained to the medical staff that he was feeling weak and nauseated. (Med. Staff Notes, Doc. 114-2 at 10). Consequently, Jordan was housed in the jail's medical unit overnight and was pushed liquids. (Id.). The next day, Jordan reported that he was feeling better and was returned to his barracks. (Id.). A blood sample was taken from Jordan that day and sent for testing. (Lab Report, id. at 12). The results were returned on July 2, 2010, and revealed critical levels of low sodium and high potassium. (Id. at 11-12).

On July 2, 2010, Jordan was transferred to the BCCC on an outstanding warrant. (Doc. 135 at 17, p. 65).[6] On that date, a BCCC officer prepared a medical report on Jordan, which Jordan signed. (Doc. 113-1 at 2-3). In a section marked "Current Medications," the report lists "TAKE

---

[4] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the Plaintiff,] the nonmoving party." Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997). Moreover, on summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). See also, e.g., Sharpe v. Global Sec. Int'l, 766 F. Supp. 2d 1272, 1282 (S.D. Ala. 2011) (Steele, C.J.) ("[T]he Court . . . will not independently examine uncited portions of the record in search of support for a particular proposition[ on summary judgment]." (citing cases)).

[5] Addison's disease causes a sufferer's adrenal glands to produce insufficient cortisol, which is a substance that helps the body regulate sodium and potassium levels, blood sugar, and blood pressure. (Dr. Sherman Depo., Doc. 113-5 at 18, p. 66).

[6] Williams contends that Metro Jail did not transfer Jordan's medical file or inform BCCC staff of Jordan's medical condition.

MEDS FOR ADDISON'S DISEASE[]." (Id. at 3). A "Comments" section of the report also noted: "INMATE HAS ADDISON'S DISEASE[.]" (Id.).

Nurse Williams became a licensed practical nurse (LPN) in 1984. (Williams Depo., Doc. 113-4 at 4, p. 9). At the time of the relevant events in this action, Nurse Williams worked as an LPN at the BCCC. (Id. at 3, p. 8). She retired from the BCCC on November 30, 2012, after ten years in that capacity. (Id.) Prior to working at the BCCC, she served as an LPN for ten years at Holman Prison in Atmore, Alabama. (Id. at 4, pp. 11-12).

On July 8, 2010, Nurse Williams arrived to work at the BCCC at approximately 2:00 p.m. (Id. at 8, p. 28). According to Nurse Williams's notes (Doc. 113-1 at 9-10), which are represented to have been written as the night progressed, the following occurred:[7]

At approximately 4:00 p.m. (1600 hours), Nurse Williams responded to a "code blue"[8] in the BCCC's U block, where she found Jordan lying supine on the floor with his hand under his head and his right leg elevated. (Doc. 113-1 at 9). Nurse Williams performed a medical assessment of Jordan. Jordan's skin was warm and dry to the touch, his blood pressure was 98/72, his heart rate was 85 bpm, and his oxygen saturation was 100%. (Id.). Jordan stated to Nurse Williams: "I'm sick." "I passed out." "I need to go to the hospital." "When I was at Metro they sent me to the hospital and gave me IV fluids." "I feel worse now than then." (Id.). Jordan also told Nurse Williams that he had not had his medication in approximately 2-3 months. (Id.).

After the "code blue," Nurse Williams took Jordan to M block, where he could be monitored more closely. (Doc. 113-4 at 25, p. 96). Jordan was able to walk on his own, and Nurse Williams

---

[7] Williams was aware that Jordan had been sick the day before and had told another nurse then that he was dehydrated. (Doc. 131 at 12, p. 47).

[8] At the BCCC, a "code blue" indicates a medical problem where either an inmate is unresponsive or a jail officer is incapable of handling the inmate (e.g. getting the inmate back into his bunk) and a medical assessment is needed. (Doc. 113-4 at 9, p. 31).

walked with Jordan to M block.  (Id. at 28, p. 106).  At M block, Nurse Williams had Jordan lie on the floor on a mat and blanket.  (Id. at 16-17, pp. 60-62).

At approximately 4:30 p.m. (1630 hours), Nurse Williams was told that Jordan's mother had called, saying that "he's going to pass out" and that her "son needs to go to the hospital."[9]  (Doc. 113-1 at 9).  At approximately 6:30 p.m. (1830 hours), around the time for Jordan's evening meal, Nurse Williams received a call from an M block officer informing her that Jordan was throwing up, moaning, and saying that he needed to go to the hospital.  (Id.; Doc. 131 at 16, pp. 62-63).  Nurse Williams telephoned Dr. Charles E. Sherman ("Dr. Sherman"), the BCCC's staff physician, informing him that a "code blue" had been called for Jordan due to him passing out, that his blood pressure at the time was 98/72 (which Dr. Sherman opined "is better than it was"), and that both Jordan and his mother were saying that he needed to go to a hospital.[10]  (Doc. 113-5 at 26-27, pp. 100-02).  Dr. Sherman claims that during this phone call Nurse Williams told him she believed that Jordan and his mother were "putting on" about Jordan's symptoms and that "[s]he didn't think there was anything to that."  (Id. at 27, pp. 102-03).[11]

At the time Nurse Williams called him, Dr. Sherman believed that Jordan had Addison's disease and that Jordan had some dehydration.  (Id. at 27, pp. 103-04).  However, he didn't believe that Jordan was suffering an Addisonian crisis, as "his blood pressure wasn't super low[,] [h]e wasn't short of breath[,] [h]e wasn't diaphoretic[,] [h]e wasn't having severe abdominal pain, wasn't

---

[9] In emergency situations, the BCCC nursing staff could call an ambulance to have inmates taken to the hospital without first consulting the facility doctor.  (Pimperl Depo., Doc. 113-2 at 11, pp. 38-39; Williams Depo., Doc. 113-4 at 7-8, pp. 24-25).

[10] At the time she called Dr. Sherman, Williams was aware that Jordan suffered from Addison's disease, that he had been sick and dehydrated the day before, and that he had previously been prescribed and administered Prednisone and Gatorade.  (Williams Depo., Doc. 131 at 12, pp. 46-48).

[11] Williams denies, or at least does not remember, telling Dr. Sherman anything suggesting a belief that Jordan and/or his mother were faking his symptoms.  (Doc. 113-4 at 22-23, pp. 84-85).

pale." (Id. at 19, p. 71). Dr. Sherman ordered Nurse Williams to give Jordan 25 mg of Phenergan and to feed him clear liquids (e.g. chicken broth) that night. (Id. at 28, pp. 107-08; Doc. 113-1 at 9).[12] Nurse Williams brought Jordan 2 Styrofoam cups of warm broth and encouraged him to sip liquids only. She also administered Phenergan to Jordan through a shot. During this time, Jordan was lying on his mat on the floor and stated "I've never felt this bad" and "I'm dehydrated." (Doc. 113-1 at 9-10).

Nurse Williams testified at deposition that she checked on Jordan "two or three" times that evening after administering him the Phenergan. (Doc. 131 at 16-17, pp. 64-65). At approximately 7:30 p.m. (1930 hours), an officer informed Nurse Williams that Jordan was asleep, with his chest rising and falling. (Id. at 10). At approximately 8:00 p.m., an officer informed Nurse Williams that Jordan was lying on his mat watching television. (Id.). Nurse Williams went to M block again at approximately 9:45 p.m. (2145 hours), where she observed Jordan lying on his mat, pull his blanket up, close his eyes, and appear to go to sleep. (Id.; Doc. 131 at 17, pp. 66-67). Jordan voiced no further complaints of nausea or vomiting that were relayed to Nurse Williams. (Doc. 113-1 at 9-10; Doc. 113-4 at 14, pp. 49-50).

Jemal Walker ("Walker"), another BCCC inmate, was in the medical unit when Jordan was brought in around 4:00 p.m. on July 8, 2010. (Walker Aff., Doc. 130 at 1-2, ¶ 2). Jordan "appeared weak and sick" to Walker and "vomited a few times shortly after he got there." (Id.). Later that evening, Walker observed a nurse (presumably Nurse Williams) bring in chicken broth and food. (Id. at 2, ¶ 3). Walker heard Jordan tell the nurse "that he was very sick and needed to go to the hospital." (Id.). Walker then heard the following exchange:

> The nurse said that [Jordan] could not go without a doctor's order and the doctor said

---

[12] Earlier on July 8, 2010, Jordan approached Defendant Pimperl to tell her that he did not feel well. Pimperl called Dr. Sherman to report Jordan's condition. At that time, Dr. Sherman prescribed Gatorade and a tapering dosage of Prednisone for Jordan.

he did not need to go. Jordan repeated what he had said and the nurse said "what are you in here for?" and Jordan said "for pot" and the nurse said "well, if you hadn't used pot you could go to the hospital." Because of the way the nurse talked to Jordan it was my impression that she did not pay him any attention or show any concern.

(Id.)

Walker states that no one came into M block to check on Jordan after the nurse delivered the broth. (Id., ¶ 5). Jordan was lying on the floor under a glass window. (Id.). Walker tried to help Jordan eat some of the broth, but Jordan was too nauseated to eat much. Walker observed Jordan vomit "a couple of times" and helped Jordan to the shower to get him clean, as Jordan was unable to get up and do so himself. (Id., ¶ 4). Jordan "kept telling [Walker] that he was going to die if they did not get him to the hospital." (Id.).

Later that evening, Walker helped Jordan get situated on his mat. A little while later, after Jordan closed his eyes and Walker believed he was asleep, Walker went over to him and felt he was warm to the touch. (Id., ¶ 6). A short time later, Walker again went over to check on Jordan, this time finding him cold to the touch and with no pulse. (Id. at 2-3, ¶ 6). Walker then reported this to a corrections officer, though "[i]t took about 15 to 20 minutes for anyone to come in the medical unit." (Id. at 3, ¶ 6). Jordan died on July 9, 2010, at the BCCC.

**IV. Analysis**

    **a. Plaintiff's Motion for Relief under Fed. R. Civ. P. 37 & Motion to Strike**

After the motion for summary judgment was filed, Plaintiff filed a motion for relief under Federal Rule of Civil Procedure 37 (Doc. 120) requesting, *inter alia*, that the Court "issue an Order precluding any party from using as evidence, . . . on any motion, . . . any tapes of telephone conversations between the deceased and his mother that were not produced or provided to [Plaintiff] until August 6, 2013, after the August 1, 2013 discovery deadline." (Id. at 1 (footnote omitted)).

Contemporaneous with its response in opposition to the present motion for summary judgment,

Plaintiff also filed a motion to strike from consideration the same recordings, as well as the unsworn

reports of certain defense expert witnesses (Williams Exs. P & Q) (Doc. 127).[13]  However, the Court

finds Plaintiff's motion to strike (Doc. 127) and, to the extent it applies to the present motion for

summary judgment, his Rule 37 motion (Doc. 120) to be **MOOT**, as the Court has not relied on any

of the offending evidence in making its determinations, see infra.

### b.    § 1983 Claim[14]

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to be

---

[13]

> [I]n the aftermath of the substantive 2010 amendments to Rule 56, it appears that motions to
> strike summary judgment exhibits are no longer appropriate. As revised, Rule 56 provides
> that "[a] party may object that the material cited to support or dispute a fact cannot be
> presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The
> Advisory Committee's note specifies further that such an objection "functions much as an
> objection at trial, adjusted for the pretrial setting" and that "*[t]here is no need to make a
> separate motion to strike.*" Id. advisory committee's note (emphasis added).[FN5]
>
>> FN5 – The Court acknowledges that, as to the propriety of motions to strike
>> evidence submitted in support of or in opposition to a motion for summary
>> judgment, Alabama and federal procedures differ. Quite recently, the Alabama
>> Supreme Court reaffirmed its adoption of the old federal practice that a party must
>> move to strike an affidavit that violates Rule 56 lest his objection be considered
>> waived. See Ex parte Secretary of Veterans Affairs, —— So.3d ——, No. 1101171,
>> 2012 WL 415479, at *5 (Ala. Feb. 10, 2012) (citing Perry v. Mobile Cnty., 533
>> So.2d 602 (Ala. 1988)). However, as three dissenting justices recognized, the
>> federal summary judgment rule no longer reads as it did a quarter-century ago, and
>> it is now clear that, in federal court, "a motion to strike is not desired." Id. at *12 n.
>> 8 (Murdock, J., dissenting).

N. Assur. Co. of Am. v. C & G Boat Works, Inc., Civ. A. No 11-00283-KD-N, 2012 WL 1712594, at *5 &
n.5 (S.D. Ala. May 15, 2012) (DuBose, J.).

[14] The Eleventh Circuit has held that Alabama's survivorship law, Ala. Code § 6-5-462, applies to § 1983
actions.  See Estate of Gilliam ex rel. Waldroup v. City of Prattville, 639 F.3d 1041 (11th Cir. 2011), cert.
denied, 132 S. Ct. 817 (2011).  "Under that provision, 'a deceased's unfiled tort claims do not survive the
death of the putative plaintiff.' "  Id. at 1046 (quoting Bassie v. Obstetrics & Gynecology Assocs. of
Northwest Ala., P.C., 828 So. 2d 280, 282 (Ala. 2002)).  However, "when a constitutional violation actually
causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute,
Ala. Code § 6–5–410."  Id. at 1047.  Accord Kruse v. Corizon, Inc., Civ. A. No. 12-0212-WS-B, 2013 WL
3366040, at *2-3 (S.D. Ala. July 5, 2013) (Steele, C.J.) (discussing Estate of Gilliam).

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

Plaintiff's § 1983 claim against Nurse Williams alleges that, "acting under color of state law[,]" she was "deliberately indifferent to Jacob Jordan's serious medical needs related to his Addison's Disease[,]" thus "depriv[ing] Jacob Jordan, the Plaintiff's decedent, of his rights as a pre-trail detainee under the Fourteenth Amendment to the Constitution of the United States . . ." (Doc. 75 at 14-16, ¶¶ 36-37).

Williams asserts that she is entitled to qualified immunity as to Plaintiff's § 1983 claim. The Eleventh Circuit has set forth the following the analysis for applying qualified immunity:

"The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (internal quotation marks omitted). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. ----, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009). "[Q]ualified immunity is a privilege that provides 'an *immunity from suit* rather than a mere defense to liability.' " Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008) (quoting Saucier v. Katz, 533 U.S. 194, 200-01, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001)) . . .

"To invoke qualified immunity, the official first must establish that he was acting within the scope of his discretionary authority" when the alleged violation occurred. Id. at 1325. "If, interpreting the evidence in the light most favorable to the plaintiff, the court concludes that the defendant was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). "[T]he plaintiff must ... show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Id. "The judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 129 S. Ct. at 818.

<u>Townsend v. Jefferson Cnty.</u>, 601 F.3d 1152, 1157-58 (11th Cir. 2010). " '[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.' " <u>Messerschmidt v. Millender</u>, 132 S. Ct. 1235, 1245 (2012) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 639 (1987) (citation omitted)). "In order to overcome summary judgment because of qualified immunity, the facts in dispute must raise a genuine issue of fact material to the determination of the underlying issue." <u>Terrell v. Smith</u>, 668 F.3d 1244, 1250 (11th Cir. 2012) (quotation omitted).

### *1.  Was Williams acting within the scope of her discretionary authority?*

In determining whether an official was "acting within the scope of his discretionary authority," the Court assesses whether the official's actions are "of a type that fell within the employee's job responsibilities. [The Court's] inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1265 (11th Cir. 2004). Though Plaintiff appears to dispute Williams's assertion that she was a government official acting within the scope of her discretionary authority at the time of the relevant events, he does not present any argument against this assertion (instead appearing to concede the point for purposes of summary judgment).[15] Regardless, the record reveals no genuine issue of material fact that Williams was a government official (i.e. a nurse employed by a county correctional facility) acting within her discretionary authority (i.e. treating inmates) at all relevant

---

[15] (<u>See</u> Doc. 128 at 24 ("Even if Defendant Jimmie Williams could show that she acted within her discretionary authority, she is not entitled to a summary judgment on the basis of qualified immunity with regard to the Section 1983 claim in this case, because it was clearly established – well before July 2010 – that a jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if he acts with deliberate indifference to the serious medical needs of the detainee.")).

times. Accordingly, "the burden shift[s] to [Plaintiff] to present evidence that [Williams] violated [Jordan's] clearly established constitutional rights." <u>Townsend</u>, 601 F.3d at 1158.

### 2. Did Williams violate Jordan's clearly established constitutional rights?

Plaintiff's § 1983 claim against Williams alleges that she was deliberately indifferent to Jordan's serious medical need (i.e. complications arising from his Addison's disease), resulting in his death. In relevant part, Plaintiff's § 1983 "deliberate indifference" claim against Williams in her Second Amended Complaint alleges:

> Before Jacob Jordan died shortly after midnight on July 9, 2010, Defendant[] . . . Williams . . . knew that Jacob Jordan suffered from Addison's Disease, knew that Jacob Jordan was becoming increasingly ill and knew that, because of the serious nature of Jacob Jordan's illness, he needed to be taken to a hospital for timely and appropriate medical treatment. In spite of this knowledge and in spite the repeated requests by Jacob Jordan and his mother, Peggy Jordan, that Jacob Jordan be taken to a hospital or else he might die, Defendant[] . . . Williams . . . with deliberate indifference failed to see that Jacob Jordan was taken to a hospital for timely and appropriate medical treatment . . . Defendant[] . . . Williams . . . had knowledge of a condition requiring timely and appropriate medical treatment, yet Defendant[] . . . Williams . . . did not take timely and appropriate action and thereby deprived Jacob Jordan, the Plaintiff's decedent, of his rights as a pre-trail detainee under the Fourteenth Amendment to the Constitution of the United States in violation of 42 U.S.C. § 1983.

(Doc. 75 at 14-16, ¶¶ 36-37).

Plaintiff's arguments in response to Williams's motion for summary judgment appear consistent with these allegations – that Williams displayed "deliberate indifference" by failing to send Jordan to a hospital for treatment despite his and his mother's repeated requests. (<u>See</u> Doc. 128 at 3-4 ("Williams knew that Jacob had not been taking his medication. In fact, the absence of medication made it even more important that Jacob be taken to the hospital." (citation omitted)), 29 ("The importance of Williams's true reason for not sending Jacob to the hospital is highlighted in <u>Rogers vs. Evans</u>, 792 F. 2d 1052 (11th Cir. 1986) . . ."), 30, 32 ("Significantly, the reason why Williams did not send Jacob to the emergency room located less than a mile from the jail is in

dispute . . . [H]ere, there are at least three possible explanations why Jacob was not sent to a hospital emergency room . . .")).

"[A] prison official's 'deliberate indifference to [the] serious medical needs of [a] prisoner[] constitutes the unnecessary and wanton infliction of pain ... proscribed by the Eighth Amendment.' " Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quotation marks and citation omitted)). "As a pre-trial detainee, [Jordan]'s rights exist[ed] under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. Nonetheless, Plaintiff[']s[] claims are subject to the same scrutiny as if they had been brought as deliberate indifference claims under the Eighth Amendment." E.g., Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009) (internal citation omitted). As such, "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." E.g., Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).

> In order to prove deliberate indifference [Plaintiff] must shoulder three burdens. First, []he must satisfy the objective component by showing that [Jordan] had a serious medical need. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curiam). Second, []he must satisfy the subjective component by showing that the prison official acted with deliberate indifference to [Jordan's] serious medical need. Id. Third, as with any tort claim, []he must show that the injury was caused by the defendant's wrongful conduct. See Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir. 1995).

Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007).

> A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739, 122 S .Ct. 2508, 2515, 153 L.Ed.2d 666 (2002). In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition. Hill, 40 F.3d at 1188–89. In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).

Mann, 588 F.3d at 1307.

Williams concedes: "[I]t is clear that Jordan had a serious medical need." (Doc. 112 at 21). Moreover, under the "alternative test" identified in Mann, *supra*, the Court finds sufficient record evidence to support a determination that Jordan's Addison's disease constituted a serious medical need, as it posed a substantial risk of serious harm if left unattended, see Williams v. Arnold, 207 F. App'x 980, 981 (11th Cir. 2006) (per curiam) ("People with Addison's disease must take medications daily or risk serious health problems, including death."),[16] and that delays in treatment appear to have worsened the condition to the point that it resulted in Jordan's death.

" 'However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." ' " Farrow, 320 F.3d at 1243 (quoting McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999) (citation omitted)). "The inadvertent or negligent failure to provide adequate medical care 'cannot be said to constitute "an unnecessary and wanton infliction of pain." ' " Id. (quoting Estelle, 429 U.S. at 105-06). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 429 U.S. at 106. See also Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Mere incidents of negligence or malpractice do not rise to the level of constitutional violations."); Mann, 588 F.3d at 1308 ("While the deputies may have made an error in judgment, mere negligence or a mistake in

---

[16] As the Magistrate Judge's Report and Recommendation noted (Doc. 95 at 12 n.6; Kruse v. Byrne, Civ. A. No. 11-00513-KD-C, 2012 WL 5469801, at n.6 (S.D. Ala. Oct. 19, 2012) (Cassady, M.J.), report and recommendation adopted in part, Civ. A. 11-00513-KD-C, 2012 WL 5470604 (S.D. Ala. Nov. 9, 2012) (DuBose, J.), Williams sidestepped the issue of whether the prisoner plaintiff's Addison's disease constituted a serious medical need. See 207 F. App'x at 984 ("Regarding the objective component of the Eighth Amendment test, Williams contends that there is no genuine issue of material fact concerning his serious medical need because neither party disputes that Addison's disease can be fatal if not properly treated. The magistrate, however, concluded that the existence of a serious medical need was not established merely by Williams' diagnosis with Addison's disease. Instead, the magistrate determined that the relevant inquiry was whether Williams' condition during the time he went without medication constituted a serious medical need. []There is no need for us to determine the correctness that determination because, even if Williams met the objective component, he has failed to create a genuine issue of material fact about the subjective component.").

judgment does not rise to the level of deliberate indifference. Plaintiffs' showing that harm resulted, without more, cannot carry the burden required for deliberate indifference.").  "Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment."  Harris, 941 F.2d at 1505.  See also Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." (quoting Estelle, 429 U.S. at 107)); Lynch v. Jackson, 478 F. App'x 613, 618 (11th Cir. 2012) (per curiam) ("Where medical treatment provided is 'minimally adequate,' no deliberate indifference exists." (quoting Harris, 941 F.2d at 1504)).

In order to establish deliberate indifference on the part of a defendant, a plaintiff must show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence." Goebert, 510 F.3d at 1327 (quotation and brackets omitted). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.' "[17] Id. (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)

---

[17] Plaintiff cites Rogers v. Evans, 792 F.2d 1052, 1061 (11th Cir. 1986), for the proposition that "[o]rdinarily, summary judgment should not be granted in cases where motive, intent, subjective feelings, and reactions are to be searched." 792 F.2d at 1059.  (Doc. 128 at 29).  However, this does not obviate the need for Plaintiff to present sufficient evidence creating a genuine issue of material fact as to any of these factors.  Cf. Rogers, 792 F.2d at 1059 ("Nothing in the record supports a factual dispute about the motives of these low level staff, who acted upon their understanding of directions from the medical staff. No specific allegation has been pleaded against any of these personnel to support an inference of callous indifference for Rogers's welfare . . . . After a full opportunity to muster all the evidence they could, [the plaintiffs] did not place a material disputed fact before the district court. Thus, the state of mind of these personnel was not at issue." (internal citation and quotation omitted)).

(citation omitted)). "Disregard of the risk is also a question of fact that can be shown by standard methods." Id. (citing Farmer, 511 U.S. at 846). Accord Martinez v. Burns, 459 F. App'x 849, 851 (11th Cir. 2012) (per curiam) ("Whether a defendant has subjective knowledge of the risk of serious harm and whether they disregarded that risk are questions of fact that can be demonstrated in the usual ways, including inference from circumstantial evidence." (citing Goebert, 510 F.3d at 1327).[18] "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Rogers v. Evans, 792 F.2d 1052, 1061 (11th Cir. 1986).

The Eleventh Circuit

> ha[s] repeatedly found that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe County, Ala., 116 F.3d 1419, 1425 (11th Cir. 1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference"). Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable. See Harris v. Coweta County, 21 F.3d 388, 393–94 (11th Cir. 1994); Brown v. Hughes, 894 F.2d 1533, 1537–39 (11th Cir. 1990) . . . [D]eliberate indifference may [also ]be established by a showing of grossly inadequate care as well as by a decision to take

---

[18] Plaintiff has cited to Chavez v. Cady, 207 F.3d 901 (7th Cir. 2000), which distinguished the standard for determining "deliberate indifference" by correctional officers from the standard applied to "a medical professional such as [a] nurse[,]" the analysis of which "is a little different":

> In Collignon v. Milwaukee County, 163 F.3d 982 (7th Cir.1998), we pointed out that the professional judgment standard applies in Fourteenth Amendment claims to decisions made by professionals such as physicians and nurses within their area of expertise. But we also said that the Fourteenth Amendment professional judgment standard is "comparable" to the deliberate indifference standard and requires "essentially the same analysis." Collignon, at 988, 989. First, a plaintiff must establish an objectively serious medical need. Then the plaintiff must show "(1) that the professional knew of the serious medical need, and (2) disregarded that need." At 989. The trier of fact can conclude that the professional knew of the need from evidence that it was obvious and, further, it can be assumed that "what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise." At 989.

207 F.3d at 904-05.

an easier but less efficacious course of treatment. See Steele v. Shah, 87 F.3d 1266, 1269–70 (11th Cir. 1996); Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel, 888 F.2d at 789; Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985).

McElligott, 182 F.3d at 1255.[19]

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." Goebert, 510 F.3d at 1327 (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003)). "Causation, of course, can be shown by personal participation in the constitutional violation." Id. (citing Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

The undisputed record evidence does not support a determination that Williams "fail[ed] or refuse[d] to obtain medical treatment" for Jordan, id. (quotation omitted), as Williams did provide Jordan some medical care, including obtaining and implementing a doctor's prescribed course of treatment. Cf. Hill, 40 F.3d 1176, 1187 (11th Cir. 1994) ("Swain personally had administered this

---

[19]     The Court rejects Williams's assertion that "where a prisoner has received medical attention and the dispute concerns the adequacy of the medical treatment, deliberate indifference is not shown . . . " (Doc. 112 at 22-23 (citing Hamm v. DeKalb County, 774 F.2d 1567 (11th Cir. 1985)) (italics omitted). See also Doc. 112 at 28 ("This case concerns the 'adequacy' of the treatment and not its constitutionality. Accordingly, Count I should be dismissed.")). This is an incorrect statement of the law. While "a simple difference in medical opinion between the prison's medical staff and the inmate" certainly does not "support a claim of cruel and unusual punishment[,]" Harris, 941 F.2d at 1505, McElligott makes clear that "a showing of grossly inadequate care" or of "a decision to take an easier but less efficacious course of treatment" can demonstrate deliberate indifference, 182 F.3d at 1255. See also id. at 1259 ("We reject Dr. Foley's argument that summary judgment was appropriate because Dr. Foley provided medical care to Elmore. 'It is ... true that when a prison inmate has received medical care, courts hesitate to find a Eighth Amendment violation.' However, Dr. Foley simply misstates the controlling law when he argues that his provision of medical care to Elmore precludes an Eighth Amendment claim. 'Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs. We reaffirm ... that grossly incompetent medical care or choice of an easier but less efficacious treatment can constitute deliberate indifference.' " (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989))

    Hamm does not indicate otherwise. In that case, the Eleventh Circuit held that "[a]lthough Hamm may have desired different modes of treatment," the record evidence supported the determination that "the care the jail provided did not amount to deliberate indifference." Hamm, 774 F.2d at 1575.

medicine to Hill and monitored him closely for this *diagnosed* medical problem. Thus, the mandated treatment for his diagnosed ailment undisputedly was received by Hill. Cf. Aldridge v. Montgomery, 753 F.2d 970, 972–73 (11th Cir. 1985) (per curiam) (holding that a state prisoner demonstrated a triable issue of fact when he presented evidence that a deputy failed to administer an ice pack and pain medication as instructed by attending doctor after suturing a wound).").  For the same reasons, the record also does not suggest that Williams could be accused of providing "medical care which is so cursory as to amount to no treatment at all . . ." McElligott, 182 F.3d at 1255 (quotation omitted).

The question, then, is whether there is sufficient evidence to show that Williams's conduct exceeded gross negligence.  "The meaning of 'more than gross negligence' is not self-evident but past decisions have developed the concept.  In cases that turn on the delay in providing medical care, rather than the type of medical care provided, [the Eleventh Circuit] ha[s] set out some factors to guide [the Court's] analysis. Where the prisoner has suffered increased physical injury due to the delay, [the Eleventh Circuit] ha[s] consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert, 510 F.3d at 1327.  The Court finds, however, that both Plaintiff's arguments and the record evidence indicate that this case turns on the type of medical care provided, rather than any delay in providing it.  Essentially, Plaintiff argues that Nurse Williams should have sent Jordan to the hospital instead of or in addition to providing treatment at the BCCC medical unit.  Such an argument, instead, suggests deliberate indifference by "a showing of grossly inadequate care" or "by a decision to take an easier but less efficacious course of treatment." McElligott, 182 F.3d at 1255.

"For medical treatment to rise to the level of a constitutional violation, the care must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to

20

fundamental fairness.' " Jackson v. Jackson, 456 F. App'x 813, 814 (11th Cir. 2012) (per curiam) (quoting Harris, 941 F.2d at 1505). See also Howell v. Evans, 922 F.2d 712, 721 n.9 (11th Cir. 1991), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), opinion reinstated sub nom., Howell v. Burden, 12 F.3d 190 (11th Cir. 1994) ("The refusal to provide proper treatment must not be simply a medical choice but a gross violation of accepted practice. When the Supreme Court set up this standard in Estelle, it referred to two cases of grossly inadequate treatment: one where the doctor injected penicillin into a patient he knew to be allergic, the other where the doctor threw away a salvageable ear and stitched the stump. 97 S. Ct. at 291 n.10."). "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted . . . Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." Farmer, 511 U.S. at 844-45.

Upon consideration of the record and the applicable authority, the Court concludes that Plaintiff has not presented sufficient evidence of deliberate indifference by Williams in her failure to send Jordan to a hospital. More specifically, while sufficient evidence has been presented indicating that Williams had subjective knowledge of a risk of serious harm,[20] sufficient evidence

---

[20] The record contains evidence that Williams was aware that Jordan suffered from Addison's disease and that he had recently been experiencing adverse symptoms. The Court notes that if, as Plaintiff asserts, Williams truly believed that Jordan was faking his symptoms, then such a fact could arguably negate her "subjective knowledge of a risk of serious harm," since she would have subjectively believed that Jordan was not in danger of any serious harm. See Campbell v. Sikes, 169 F.3d 1353, 1373 (11th Cir. 1999) ("As discussed regarding Sikes, this expert affidavit does not suffice to support a finding that Ford knew her care was grossly inadequate but persisted in that treatment. At best, it might support a finding that Ford's care was grossly inadequate or a finding that Ford should have known or perceived—or 'had to know'—her care was grossly inadequate. However, . . . '[t]here is no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not...." ' " Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996) (citing Farmer, 511 U.S. at 838, 114 S. Ct. 1970).").

Plaintiff has cited Goebert for the proposition that "[r]efusing care based on a subjective belief that a prisoner is lying about the need for care can amount to deliberate indifference . . ." (Doc. 128 at 31). The Court determines this to be too broad a reading of that case. Goebert stated that "[c]hoosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness[,]"

has not been presented showing that Williams disregarded that risk by conduct that was more than gross negligence.

Williams was not deliberately indifferent simply by failing to heed the pleas of Jordan and his mother to send Jordan to the hospital. Dr. Sherman did not tell her to send Jordan to a hospital, and "a simple difference in medical opinion between [Williams] and [Jordan] as to the latter's . . . course of treatment [does not] support a claim of cruel and unusual punishment." Harris, 941 F.2d at 1505 (citing Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989) ("Mere medical malpractice, however, does not constitute deliberate indifference . . . Nor does a simple difference in medical opinion. See Bowring v. Godwin, 551 F.2d 44 (4th Cir. 1977) ('[W]e disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment. Along with all other aspects of health care, this remains a question of sound professional judgment.') (citation omitted).")). This is particularly true since it has not been shown that Jordan or Jordan's mother had any medical training.

---

and, "[a]s []ha[s been] said in other contexts '[a] party that willfully blinds itself to a fact ... can be charged with constructive knowledge of that fact.' " 510 F.3d at 1328 (quoting United States v. Baxter Int'l, Inc., 345 F.3d 866, 902 (11th Cir. 2003)). However, the undisputed evidence does not support a finding that Williams failed to make "any investigation or inquiry" regarding Jordan's symptoms, as she performed some assessment of Jordan and also contacted Dr. Sherman for direction as to a course of treatment. By comparison, in Goebert, the Eleventh Circuit noted that the defendant jail commander's "deposition testimony, read in the light most favorable to [the plaintiff, le[d] to the conclusion that [the commander automatically disbelieved any medical complaint by an inmate." Id. Based on this determination, the court determined that the commander's "deliberate decision to automatically disbelieve all inmate statements about medical care, regardless of the circumstances, amount[ed] to a decision to withhold medical care no matter what the circumstances actually were." Id. at 1329. Such a deliberate decision was "not gross negligence, but instead [was] deliberate indifference to the true facts of an inmate's medical condition and needs." Id. See also Waldrop v. Evans, 871 F.2d 1030, 1036 (11th Cir. 1989) (". . . [P]laintiffs are challenging the lack of response to a known medical condition. In this case, Smith treated Waldrop for a self-inflicted injury when he knew Waldrop was suffering from severe psychiatric problems. Smith was not a psychiatrist and was therefore unable to evaluate the significance of this act. Nevertheless, Smith failed to notify Fodor or take any other action in response because he felt this was simply an act to attract attention. The law was clear in 1984 that prison officials have an obligation to take action or to inform competent authorities once the officials have knowledge of a prisoner's need for medical or psychiatric care. See, e.g., Estelle, 429 U.S. at 104-05, 97 S. Ct. at 291. Courts have held that failure to notify competent officials of an inmate's dangerous psychiatric state can constitute deliberate indifference.").

Moreover, the record evidence does not support a finding that Williams's actions objectively constituted conduct exceeding gross negligence or resulted from a choice to take an easier but less efficacious course of treatment. Drawing all reasonable inferences in favor of Plaintiff, the record evidence demonstrates the following sequence of events:

- Williams's first interaction with Jordan occurred around 4:00 p.m. on July 8, 2010, when she responded to a "code blue" in Jordan's cell block and found Jordan lying supine on the floor. Faced with Jordan's assertions that he was feeling sick and had passed out, she brought him to the BCCC medical unit for further observation. Jordan was able to travel from his cell to the medical unit of his own power.

- At approximately 4:30 p.m., Williams was told that Jordan's mother had called to say that her son needed to go to the hospital. At approximately 6:30 p.m., after being informed by an officer that Jordan had vomited, Williams called Dr. Sherman and reported to him Jordan's condition and symptoms. Dr. Sherman prescribed a course of treatment, which did not include sending Jordan to a hospital; Williams then administered that course of treatment.[21]

The record is unclear as to how many times Williams checked on Jordan after giving him the chicken broth and Phenergan. Walker states in his affidavit that "[n]o one came to check on Jordan after the broth was brought in." (Doc. 130 at 2, ¶ 5). Williams's notes and deposition testimony indicate that she twice asked officers in the medical unit about Jordan's condition and that she personally went to check on Jordan once, shortly before her shift ended that night.

---

[21] Cf. Keele v. Glynn Cnty., Ga., 938 F. Supp. 2d 1270, 1295 (S.D. Ga. 2013) (Wood, C.J.) ("Thompson did not have an untreated, objectively serious medical need until she developed rashes on Monday night. Nurse Orr knew of this medical need and responded appropriately to it. Specifically, he assessed Thompson's condition, called Dr. Gunderson, and complied with Dr. Gunderson's orders. Consequently, Plaintiff does not suggest that Nurse Orr was indifferent to Thompson's medical needs at this time . . . Thompson had an objectively serious medical need—rashes—during this first time period. Nurse Orr responded appropriately to this need. Consequently, Nurse Orr is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period. " (citation omitted)).

Williams represents that "there is no dispute between Walker's affidavit and []Williams's testimony" because Jordan was monitored by being observed "through his cell window" rather than entering the room. (Doc. 137 at 6-7). However, Williams's citations to the record evidence do not support this nuance in how Jordan was observed. First, she cites to her "Ex. A, Bates # 002400" (id. at 7), which is the second page of her notes made on July 8, 2010. (Doc. 113-1 at 10). While the note made at 9:45 p.m. indicates that Williams visited the medical unit to check on Jordan, no mention of a window is made. Second, Williams cites to her "Ex. E, 107:17-23, 108:1" (Doc. 137 at 7), which are pages of Dr. Sherman's deposition that also make no mention of a window being used to observe Jordan. (Doc. 113-5 at 28).[22]

As Williams has not submitted evidence indicating that either she or medical unit officers observed Jordan through a window in the medical unit, there is an issue of fact as to whether Williams visually checked on Jordan after Williams administered the chicken broth and Phenergan. However, this issue of fact is not material to whether Jordan's constitutional rights were violated by Williams. This is because the undisputed evidence indicates that Williams did, at least, twice check on Jordan's condition through telephone conversations with medical unit officers.

In an unpublished opinion,[23] the Eleventh Circuit has held that a nurse does not act with deliberate indifference when she *reasonably* follows a doctor's orders. Bauer v. Kramer, 424 F. App'x 917, 919 (11th Cir. 2011) (per curiam) ("[A] nurse is not deliberately indifferent when she reasonably follows a doctor's orders by administering prescribed medication to an inmate." See

---

[22] A "Control+F" search of Dr. Sherman's deposition did not turn up one use of the word "window." A similar search of Williams's deposition revealed testimony discussing the presence of a window in the medical unit "through which the correctional officers could look down and see him." (Doc. 113-4 at 23, pp. 87-88).

[23] "Citation to unpublished opinions on or after January 1, 2007 is expressly permitted under Rule 32.1, Fed. R. App. P. Unpublished opinions may be cited as persuasive authority pursuant to the Eleventh Circuit Rules. 11th Cir. R. 36–2." Gibbs v. United States, 865 F. Supp. 2d 1127, 1151 n.8 (M.D. Fla. 2012).

also Holloway v. Delaware Cnty. Sheriff, 700 F.3d 1063, 1075 (7th Cir. 2012) ("As a matter of professional conduct, nurses may generally defer to instructions given by physicians, 'but that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient.' Berry v. Peterman, 604 F.3d 435, 443 (7th Cir. 2010). A nurse may therefore act with deliberate indifference if he or she 'ignore[s] obvious risks to an inmate's health' in following a physician's orders. Rice ex rel. Rice v. Corr. Med. Servs., 675 F.3d 650, 683 (7th Cir. 2012)."); Thayer v. Adams, 364 F. App'x 883, 891 (5th Cir. 2010) (per curiam) ("Because [Nurses ]Gonzales and Flisowski were not empowered to take action contrary to doctor's orders, their inability to alleviate Thayer's pain is not a grievance of constitutional magnitude."). Other districts in this Circuit have found Bauer to be persuasive, see, e.g., Billue v. Gualtieri, No. 8:13-CV-546-T-30TGW, 2013 WL 1405945, at *4 (M.D. Fla. Apr. 8, 2013) (Moody, J.) ("A nurse is not deliberately indifferent when he/she reasonably follows a doctor's orders." (citing Bauer)) (slip copy); Welch v. Valentine, No. 5:10-CV-43 MTT, 2012 WL 3637738, at *3 (M.D. Ga. July 13, 2012) (Weigle, M.J.), report and recommendation adopted, No. 5:10-CV-43 MTT, 2012 WL 3627559 (M.D. Ga. Aug. 22, 2012) (Treadwell, J.) ("[A] nurse is not deliberately indifferent when she reasonably follows a doctor's orders." (citing Bauer)), as does this Court.

The undisputed evidence indicates that, after being told that Jordan had vomited after being taken to the medical unit, Nurse Williams obtained and followed a course of treatment from Dr. Sherman, which did not include sending Jordan to the hospital. Though Plaintiff argues that Williams's alleged disbelief in the seriousness of Jordan's symptoms caused her to deliberately or recklessly omit details from Dr. Sherman as to Jordan's condition, and Plaintiff's nursing expert opines that Dr. Sherman might have ordered Jordan taken to the hospital had he known these details, see infra, the record does not support a determination that any such omission constitutes something more than negligence. Plaintiff argues that Nurse Williams both could and should have

made the decision on her own to send Jordan to the hospital. However, the undisputed evidence indicates that Williams checked on Jordan at least twice after administering Dr. Sherman's prescribed treatment and received no indication that Jordan's condition was worsening. As such, the record does not support a determination that Nurse Williams "ignore[d] obvious risks to an inmate's health in following [Dr. Sherman's] orders." Holloway, 700 F.3d at 1075 (quotation omitted) (alterations added).[24]

"In a medical treatment case, a plaintiff may demonstrate the existence of a clearly established medical standard either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession. Plaintiffs frequently resort to the contemporary standards of the medical profession when the challenged action required the exercise of medical judgment. In such an instance, a plaintiff may produce opinions of medical experts asserting that the inmate's treatment was so grossly contrary to accepted medical practices as to amount to deliberate indifference." Adams, 61 F.3d at 1543 (internal citations omitted). The Eleventh Circuit "has indicated that the testimony of medical experts can aid the court in determining whether qualified immunity is appropriate where allegations hinge upon the appropriateness of the actions of medical professionals . . ." Dolihite v. Maughon by & through Videon, 74 F.3d 1027, 1046 (11th Cir. 1996). See also Rogers, 792 F.2d at 1058, 1062 ("Whether an instance of medical misdiagnosis resulted from deliberate indifference or negligence is a factual question requiring exploration by expert witnesses . . . Whether the Prolixin was a matter of gross incompetence, negligence, or medical judgment is disputed and a proper subject of expert testimony."). "Such expert medical testimony, making reference to specific deficiencies in a

---

[24] Walker indicates in his affidavit that Jordan "vomited a couple of times and []could not get up by himself to get cleaned up" after Nurse Williams brought Jordan the chicken broth. (Doc. 130 at 2, ¶ 4). However, Walker admits that he helped Jordan clean himself up in the shower (id.), and there is no evidence that Nurse Williams was aware of these vomiting episodes.

defendant's treatment and specific medically accepted standards might, in conjunction with the specific facts of a case, persuade a court that the medical defendant's actions in the case were clearly as great a departure from appropriate medical standards as previous departures found unconstitutional in prior cases—i.e., might persuade a court that a reasonable professional in defendant's shoes would have known that his challenged actions (or inaction) violated plaintiff's constitutional rights." Dolihite, 74 F.3d at 1046.

Plaintiff's nursing expert, Sandra Tilton, states only that "[i]t's [her] opinion that [Williams] did not follow the standards of care when she assessed Mr. Jordan." (Tilton Depo., Doc. 134-1 at 27, p. 107). In support of this opinion, Tilton notes:

> The statements that he made to her, she did not further question him or write her observations down regarding his physical and -- well, not just his physical condition. She did not question him further. Like when he complained of being dizzy, she didn't question him about had he injured himself in any way, did he have a positive gait. At that particular time when she gave him medication, she did not go back 30 to 45 minutes later and ask him how the medicine had affected him, did it take care of the problem. In her notes at 4 o'clock, she noted that he was getting Gatorade and that it was a half-full container. At no time did she ever go back and document how much more Gatorade he drank or if, in fact, he drank any at all, even though she knew he had been vomiting. And even though he repeatedly told her how bad he felt, and that he needed to go to the hospital, she said she did not recall giving that information to the doctor when she made the phone call to him.

(Id., pp. 107-08).

Tilton believes that "that if [Jordan] had been monitored correctly and assessed for his condition before and after, with more vital signs and questions, that [Williams] may have arranged to have him taken to the emergency room." (Id., p. 108). She also opines that Dr. Sherman could have determined that Jordan should have been sent to the hospital if Williams "had given him all the information that she had received from the patient." (Id.) Tilton states that a common ethos in prison medicine is "when in doubt, send them out," where "if what the patient is telling [a nurse] doesn't add up and [the nurse is] not sure, [the nurse is] just going to send [the patient] out . . . [t]o

the emergency room, and let them make a further assessment." (Id. at 27-28, pp. 108-09). At most, these opinions place Williams's actions on the level of negligence and are insufficient to support a claim of deliberate indifference. Cf. Adams, 61 F.3d at 1546 ("In his deposition testimony, the appellees' expert, Dr. DiBenedetto, concedes that Dr. Poag's course of treating Adams 'seemed to be adequate.' He states, however, that the treatment she rendered was inadequate because 'there should have been some follow-up in three or four days when he [Adams] indeed was getting very bad.' He also stated that Dr. Poag should have performed pulmonary function studies . . . [W]e are unable to conclude that the appellees' allegations against Dr. Poag rise to the level of deliberate indifference. Accordingly, we reverse the district court's denial of qualified immunity as to Dr. Poag.").[25] But cf. Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989) ("Although all actions taken by Fodor are undisputed, the question of whether these actions constituted grossly

---

[25] Adams in turn, reached its decision as to Dr. Poag by comparing the plaintiff's expert testimony to that from a previous case, Howell v. Evans, 922 F.2d 712, 719 (11th Cir. 1991), vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), and opinion reinstated sub nom., Howell v. Burden, 12 F.3d 190 (11th Cir. 1994):

> In Howell v. Evans, the widow of a prison inmate who died from severe asthma sought to impose section 1983 liability on one of the decedent's treating physicians. The plaintiff did not contend, however, that the treatment rendered by the physician was inappropriate at the time. Instead, the plaintiff asserted that as the decedent's condition worsened, a stronger course of treatment was required; that the physician should have known that the decedent's condition required close attention and could deteriorate at any moment; and, that the treating physician's failure to closely monitor the decedent constituted deliberate indifference. The court, however, rejected the plaintiff's claim on the grounds that none of the allegations satisfied the criteria for deliberate indifference. Howell, 922 F.2d at 721. At most, the appellees' allegation against Dr. Poag is that she did not diligently pursue alternative means of treating Adams's condition. In Howell, however, the court held that such an allegation did not "rise beyond negligence to the level of a refusal to treat as outlined by Estelle." Howell, 922 F.2d at 721. As the court noted in Howell: "Estelle requires, however not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment." Howell, 922 F.2d at 721. As was the case in Howell, we are unable to conclude that the appellees' allegations against Dr. Poag rise to the level of deliberate indifference. Accordingly, we reverse the district court's denial of qualified immunity as to Dr. Poag.

Adams, 61 F.3d at 1546 .

incompetent or otherwise deliberately indifferent medical care remains a contested issue. Dr. James B. Craig testified that Fodor's treatment of Waldrop was proper and that Fodor exercised reasonable professional skill and care. Dr. Slaughter, Waldrop's original treating physician, testified that these decisions were cruel and inhuman. We hold that Fodor is not entitled to summary judgment because he has failed to establish the absence of disputed issues of material fact." (quotation marks omitted)).

In <u>Adams v. Poag</u>, the Eleventh Circuit, faced with facts analogous to the ones in the instant case, reversed a denial of qualified immunity to a nurse defendant on a "deliberate indifference," as follows:

> Nurse Cody first examined Adams on September 16, 1989, when he complained of breathing difficulties. Following a telephone consultation with Dr. Poag, she administered Theophylline elixir. Nurse Cody also treated Adams on September 29, 1989; however, after examining him and failing to detect any respiratory distress, she did not provide him any medication or refer his condition to other medical personnel. Nurse Cody asserts that she did not provide Adams any additional medication on that occasion because he had been given medication one hour earlier and she thought Adams should give the medication time to take effect. Nurse Cody examined Adams again on October 3, 1989, did not detect any respiratory distress, found that he had good air return and, therefore, returned Adams to his dormitory without administering any medication or consulting with other medical personnel. Finally, on October 4, 1989, Nurse Cody administered Theophylline elixir on the orders of a physician assistant.

> The appellees assert that Nurse Cody on a number of occasions denied Adams medical treatment or refused to allow him access to further treatment with other medical personnel. Appellees specifically point to Nurse Cody's treatment of Adams on September 29 and October 3, 1989 as grossly inadequate. They submitted the affidavit of Freddie S. Hepner, a registered nurse, stating that Nurse Cody's failure to alert a doctor on those two occasions to Adams's condition was grossly inadequate. We disagree. Initially, we note that the appellees do not contend that Nurse Cody declined to examine Adams on the two occasions in question. Moreover, on both occasions she apparently evaluated Adams's condition and made the medical determination that his condition did not require that she notify other medical personnel. The appellees do not point us to any case in existence prior to the events in question that would lead a reasonable nurse in Nurse Cody's position to conclude that her actions in treating Adams constituted deliberate indifference. Nor do they assert that contemporary standards of the medical profession required Nurse Cody to alert other medical personnel of Adams's condition after she had made the

independent medical determination that such a course of action was not necessary. Appellees also do not assert that Nurse Cody's examinations of Adams were so cursory as to constitute deliberate indifference. In fact, Dr. DiBenedetto concedes that Adams was examined every time he visited sick call. Dr. DiBenedetto also concedes that he cannot assert that any of the examinations performed by the nurses at MGCC were below the standards of the medical profession.

Ultimately, the appellees allegations against Nurse Cody can be reduced to the assertion that she failed to recognize and treat Adams's progressively deteriorating condition. Our review of the record convinces us that the appellees cannot support the claim that Nurse Cody, or the other appellants, recklessly failed to detect Adams's admittedly deteriorating condition. This is a tragic case. The appellees, however, at most, have made out a colorable claim of medical malpractice. Therefore, we reverse the district court's denial of qualified immunity as to Nurse Cody.

61 F.3d at 1547-48.

As with Nurse Cody, Plaintiff's § 1983 claim against Nurse Williams "can be reduced to the assertion that she failed to recognize and treat [Jordan]'s progressively deteriorating condition[,]" and nothing in the record indicates that this failure rises above "a colorable claim of medical malpractice." Id. at 1548.

As the record reveals no genuine issue of material fact that Nurse Williams's actions on July 8, 2010, did not constitute deliberate indifference to Jordan's serious medical need, the Court finds that Nurse Williams's motion is due to be **GRANTED** as to Plaintiff's § 1983 claim against her.[26]

### c. Remaining State Law Claims

As the Court has determined that Williams is due to be granted summary judgment as to Plaintiff's federal claim against her, the only remaining claims in this action are the state law claims asserted against Nurse Williams and Dr. Sherman (against whom no federal claims have been asserted (see Second Amended Complaint, Doc. 75)). No basis for original jurisdiction over these claims has been pled, nor is any apparent from the record. Rather, the Court has exercised

---

[26] As such, the Court need not address Nurse Williams's arguments as to causation, or whether Jordan's rights were clearly established at the time of his death.

supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a). However, § 1367(c)(3) states: "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction . . ." In such circumstances, the undersigned has routinely done so,[27] and the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial." Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (per curiam). See also United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); Mergens v. Dreyfoos, 166 F.3d 1114, 1119 (11th Cir. 1999) ("[T]his Court has noted that 'if the federal claims are dismissed prior to trial, Gibbs strongly encourages or even requires dismissal of state claims.' " (quoting L.A. Draper & Son v. Wheelabrator–Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984) (citing Gibbs, 383 U.S. at 726))); Dockens v. Dekalb Cnty. Sch. Sys., 441 F. App'x 704, 709 (11th Cir. 2011) (per curiam) ("Once the district court properly granted summary judgment for the School System on the FMLA claims, no federal claims remained. It was not abuse of discretion for the court to decline supplemental jurisdiction over the state law claim.").[28]

---

[27] See, e.g., Mongham v. Soronen, Civ. A. No. 12-00288-KD-B, 2013 WL 705390, at *6 (S.D. Ala. Feb. 26, 2013) (DuBose, J.); Bandy v. Midland Funding, LLC, Civ. A. No. 12-00491-KD-C, 2013 WL 210730, at *10 (S.D. Ala. Jan. 18, 2013) (DuBose, J.).

[28] Plaintiff's remaining state law claims, for medical malpractice and wrongful death under Alabama law, are subject to a two-year statute of limitations. See Johnson ex rel. Estate of Darnell v. Brookwood Med. Ctr., 946 So. 2d 849, 853 (Ala. 2006) ("It is well established that the two-year limitations period found in § 6-5-410, Ala. Code 1975, for asserting wrongful-death actions (and not § 6-5-482, Ala. Code 1975, the medical-malpractice limitations period) applies to wrongful-death cases alleging medical malpractice. Hall v. Chi, 782 So. 2d 218 (Ala. 2000); and McMickens v. Waldrop, 406 So. 2d 867 (Ala. 1981)."). The statute of

Accordingly, the Court makes no ruling as to Plaintiff's state law claims against Williams and Dr. Sherman, as set out in Counts IV, V, and VI of the Second Amended Complaint (Doc. 75), and instead finds that they are due to be **DISMISSED without prejudice**. <u>See, e.g.</u>, <u>Ingram v. Sch. Bd. of Miami-Dade Cnty.</u>, 167 F. App'x 107, 109 (11th Cir. 2006) (per curiam) ("When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court. <u>Crosby v. Paulk</u>, 187 F.3d 1339, 1352 (11th Cir. 1999) ('If he decides to dismiss these state-law claims, then they should be dismissed without prejudice so that the claims may be refiled in the appropriate state court.').").

## V. Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that Defendant Jimmie Williams's Motion for Summary Judgment (Doc. 110) is **GRANTED** as to Plaintiff's federal claim brought against her under 42 U.S.C. § 1983 (Count I of the Second Amended Complaint (Doc. 75)), which is **DISMISSED with prejudice**. It is further **ORDERED** that Plaintiff's state law claims against Defendants Jimmie Williams and Charles E. Sherman (Counts IV, V, and VI of the Second Amended Complaint (Doc. 75)) are **DISMISSED without prejudice**.[29]

---

limitations began running from the date of Jordan's death – July 9, 2010. <u>See</u> Ala. Code § 6-5-410(d) ("The action must be commenced within two years from and after the death of the testator or intestate."). This action was commenced on September 7, 2011. (Doc. 1). However, § 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." <u>Accord Martinez v. City of Orlando</u>, No. 6:09CV802-ORL-22GJK, 2009 WL 3048486, at *2 (M.D. Fla. Sept. 21, 2009) (Conway, J.) ("28 U.S.C. 1367(d) provides that the statute of limitations is tolled while state law claims are pending in federal court until thirty days after an order of dismissal. Therefore, Plaintiff may pursue her state claims in state court if she so chooses, as long as she files in a timely manner."); <u>Lewis v. DeKalb Cnty. Bd. of Educ.</u>, No. 5:11-CV-02627-JEO, 2013 WL 6073519, at *8 (N.D. Ala. Nov. 18, 2013) (Ott, M.J.); <u>Gainor v. Douglas Cnty., Ga.</u>, 59 F. Supp. 2d 1259, 1296 (N.D. Ga. 1998) (Carnes, J.). Accordingly, dismissal of Plaintiff's remaining state law claims will not prejudice her ability to timely refile them in state court.

[29] As such, Williams's Motion to Stay Pretrial Deadlines (Doc. 147) is **DENIED as moot**.

Final judgment in accordance with this and previous Orders shall be entered by separate document.

**DONE** and **ORDERED** this the **3rd** day of **December 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**